**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Carl HACH and Francis Hach,
Defendants–Appellants.**

**Nos. 98–1691, 98–1801.**

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 18, 1998.

Decided Dec. 9, 1998.

Peggy A. Lautenschlager, Larry Wsalek (argued), Office of the United States Attorney, Madison, WI, for Plaintiff–Appellee.

Mark A. Eisenberg (argued), Eisenberg Law Offices, Madison, WI, for Defendant–Appellant Carl J. Hach.

Charles W. Giesen (argued), Giesen Law Offices, Madison, WI, for Defendant–Appellant Francis Hach.

Before POSNER, Chief Judge, FLAUM, and KANNE, Circuit Judges.

FLAUM, Circuit Judge.

This case presents us with the combined direct appeals of Francis "Butch" Hach ("Butch") and Carl Hach ("Carl"). The Haches, father and son respectively, were involved in cocaine use and dealing in Cooksville, Wisconsin, from the late 1980's until their arrests in 1997. The two men were indicted for conspiracy to distribute cocaine along with Anthony and Nicholas LaCorcia.

Butch Hach was tried and convicted by a jury in January 1998, and was sentenced to 240 months imprisonment. He raises a bevy of issues on appeal, asking that his conviction be reversed, or in the alternative, that his sentence be vacated or remanded. Carl Hach pleaded guilty to the conspiracy and was sentenced to 188 months imprisonment. He only asks that we remand his case for resentencing. For the reasons set out below, we affirm Butch's conviction, and affirm Butch and Carl's sentences.

## FACTS

The Haches lived in Cooksville, Wisconsin at the Cooksville Blacksmith Shop, which Butch owned. Beginning sometime in the late 1980's Butch and Carl began to purchase cocaine first from Mark LaCorcia (now deceased), then from Nick LaCorcia, and after Nick was incarcerated, from the third LaCorcia brother, Tony. The LaCorcias also had a partner, Tom Sajenko, who frequently couriered drugs and money to and from the Haches.

The defendants received their cocaine at the Blacksmith Shop. The cocaine was weighed on Carl's scale, and delivered to the

defendants in their respective bedrooms. The Haches sometimes resold the cocaine they obtained from the LaCorcias and Sajenko. Tony LaCorcia continued delivering cocaine to the Haches until May, 1997, when law enforcement authorities executed a search warrant on the Blacksmith Shop. At that time, Carl agreed to cooperate with law enforcement. Due to Carl's cooperation, Tony LaCorcia was arrested by the authorities.

At the defendants' separate sentencing hearings, the district court made factual findings concerning the amount of drugs attributable to the conspiracy and to Butch and Carl individually. The district court attributed between 5.4 and 8.3 kilograms of cocaine to the conspiracy. It also held that based on the joint participation of the defendants, each was accountable for the entire amount. In addition, Butch received a two point adjustment to his sentence pursuant to the Sentencing Guidelines' obstruction of justice enhancement for false testimony at trial and sentencing. Butch was also found to have a criminal history category II based on a 1985 conviction for operating a motor vehicle while under the influence of alcohol. Finally, the district court imposed a $20,000 fine on Butch after determining that his net worth was in excess of $50,000.

## ANALYSIS

### I.

### *Butch Hach's Appeal of His Conviction*

Butch Hach contends that his conviction should be overturned on numerous grounds. We discuss, and reject, each of his arguments in turn.

### A.

▪ Among his arguments, Butch contends that the district court erred in denying his Rule 29(a) motion for a judgment of acquittal. We review this argument first, because, should we find in his favor, the remainder of his appeal is moot. We apply a de novo standard of review to the district court's denial of a motion for acquittal made pursuant to Fed. R. of Crim. P. 29(a). *United States v. Draves*, 103 F.3d 1328, 1331 (7th Cir.), *cert. denied*, —— U.S. ——, 117 S.Ct. 2528, 138 L.Ed.2d 1028 (1997). When a defendant avers a lack of sufficient evidence, the question both the district court and this Court ask is whether evidence exists from which any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.* at 1332. Proving that no such evidence exists presents "a nearly insurmountable hurdle to the defendant." *United States v. Pulido*, 69 F.3d 192, 205 (7th Cir.1995) (quoting *United States v. Teague*, 956 F.2d 1427, 1433 (7th Cir.1992)). If, after viewing the evidence in the light most favorable to the prosecution, we believe that a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt, we will affirm. *United States v. Pribble*, 127 F.3d 583, 590 (7th Cir.1997). In our review, we do not weigh evidence or assess credibility issues—those tasks fall within the jury's province. *Id.* at 590.[1] Only if the record is devoid of evidence from which a jury could find guilt will we reverse. *Pulido*, 69 F.3d at 205–06.

▪ To sustain a conspiracy conviction, the record must contain evidence showing that a conspiracy to distribute cocaine existed, and that Butch Hach knowingly participated in it. *United States v. Hunter*, 145 F.3d 946, 949 (7th Cir.1998). Butch maintains that while he bought, consumed and

---

1. For that reason we do not address Butch Hach's contention that the evidence was insufficient because Tom Sajenko's testimony, which provided much of the government's ammunition against him, was "inherently unbelievable." Our review of a jury's credibility determination is generally limited to cases where it was physically impossible for the witness to observe that which he claims occurred, or impossible under the laws of nature for the occurrence to have taken place at all, *see United States v. Hunter*, 145 F.3d 946, 949–50 (7th Cir.1998), or where certain other exceptional circumstances exist. *See In re Chavin*, 150 F.3d 726, 728–29 (7th Cir.1998); *Seshadri v. Kasraian*, 130 F.3d 798, 801–02 (7th Cir. 1997) (appellate court may refuse to credit testimony "if no reasonable person would believe it."). The challenge to Sajenko's testimony implicates none of the aforementioned situations, and thus we decline to review the jury's finding.

sold cocaine, he had no agreement with the LaCorcias and Sajenko to distribute what they sold him. If he is correct, his conviction must be reversed, because, as we have held, to demonstrate a conspiracy, the government must show "proof of an agreement to commit a crime other than the crime that consists of the sale [of cocaine] itself." *United States v. Pearson*, 113 F.3d 758, 761 (7th Cir.1997) (quoting *United States v. Lechuga*, 994 F.2d 346, 347 (7th Cir.1993) (en banc)). "[A] simple agreement between a buyer and seller to exchange something of value for cocaine cannot alone constitute a conspiracy because such an agreement is itself the substantive crime." *United States v. Clay*, 37 F.3d 338, 341 (7th Cir.1994).

Butch Hach argues that his relationship with his suppliers—the LaCorcias and Tom Sajenko, and his son Carl—was just this type of arms-length buyer-seller arrangement. Butch argues that his dealers never directed him to sell the cocaine they had sold him. He seeks to bolster his case by contending, for example, that Tom Sajenko never said to him "Butch, here's some cocaine. If you can't sell it, you don't have to pay for it." According to Butch, the absence of such facts indicates the absence of a conspiracy.

■ However, we may look beyond the lack of explicit agreements and direct evidence to circumstantial evidence which tends to establish the conspiracy to distribute cocaine. *United States v. Larkins*, 83 F.3d 162, 166 (7th Cir.1996). In reviewing the record, we look for evidence of a "prolonged and actively pursued course of sales coupled with the seller's actual knowledge and a shared stake in the buyer's illegal venture." *Clay*, 37 F.3d at 341. As discussed in both *Pearson* and *Clay*, we have identified four factors as particularly salient in determining whether a conspiracy existed, and whether a defendant knowingly participated in it: (1) the length of affiliation, (2) the established method of payment, (3) the extent to which transactions were standardized, and (4) the demonstrated level of mutual trust. *See* 113 F.3d at 761; 37 F.3d at 342. Although none of these factors is dispositive, if enough are present and point to a concrete, interlocking interest beyond individual buy-sell transac-

tions, we will not disturb the fact-finders inference that at some point, the buyer-seller relationship developed into a cooperative venture. *Pearson*, 113 F.3d at 761.

The record shows that each of these factors existed in the relationship between Butch Hach and his co-conspirators, and that in the aggregate, the facts denote the "concrete and interlocked interest" required by *Pearson*. As to the length of affiliation, Butch Hach bought cocaine from the LaCorcias and Tom Sajenko for seven years. In that time, the LaCorcias and Sajenko provided Butch with cocaine on a steady basis, sometimes providing amounts fit for more than personal consumption. When one of the sellers was incarcerated or indisposed, another in the group picked up the slack.

■ The transactions were also standardized—nearly every sale had certain hallmarks. Deliveries were made almost exclusively to the upstairs bedrooms at the Blacksmith Shop; they were routinely made on Wednesdays or Thursdays. Each time, the cocaine was measured out and weighed in Carl's bedroom on Carl's scale, whether he was present or not. The payments were sometimes made at the time of delivery, and sometimes made a few days later. Sajenko testified that on occasion, if Butch did not have enough cash, Sajenko would still give him the cocaine and return for full remuneration later. Frequent and repeated transactions with an attendant established method of payment that includes a rudimentary form of credit can support a conspiracy conviction. *United States v. Fagan*, 35 F.3d 1203, 1206 (7th Cir.1994) (citing *United States v. Dortch*, 5 F.3d 1056, 1065 (7th Cir. 1993)).

These routinized deliveries indicate the fourth factor—demonstrated level of mutual trust. The Haches permitted Tom Sajenko free, unencumbered access into their living area at the Blacksmith Shop, where he was allowed to use Carl's scale to weigh to cocaine. After apportioning the drugs, Sajenko waited for Carl and Butch to join him so he could deliver them their drugs. The arrangement advanced all parties interests— the sellers had a safe place to distribute their cocaine, and the buyers (Butch and Carl) had

literally bedroom service. Immediately upon receiving the cocaine in the confines of their home, the Haches either used it themselves, or cut it and repackaged it for sale.

The length of affiliation, established method of payment and routinized transactions present here also underscore this demonstrated level of mutual trust. When Nick LaCorcia was about to go to prison, he arranged for his brother Tony to continue an uninterrupted flow of cocaine to Butch. This saved Butch from having to find an alternative source and worry about problems attendant to creating a new buyer-supplier relationship. He maintained a continuous source of drugs for himself and his clients. Sajenko and the LaCorcias benefitted from having such reliable customers even in the face of the turnover in their operation.

Viewing this concatenation of evidence, it is clear that the factors we have found salient for determining whether a conspiracy existed are present here. Moreover, Butch Hach offers little evidence of the type we have previously held suggests the absence of a conspiracy to distribute cocaine. In *United States v. Townsend,* we noted that "evidence that parties must negotiate the terms of every transaction, [or] seek to maximize their gains at the expense of others ... suggests that the transaction costs among the group are high and counsel against a finding of conspiracy between the members." 924 F.2d 1385, 1395 (7th Cir.1991); *see United States v. Plescia,* 48 F.3d 1452, 1460 (7th Cir.1995). Here, the evidence shows a pattern of routine transactions rather than individualized ones. In light of all of this, we believe that a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

## B.

■ Next, Butch Hach contends that the district court's evidentiary rulings precluding him from answering certain questions on direct examination denied him his constitutional right to put on a defense.

At trial, the district court sustained objections to questions posed by Hach's attorney concerning whether Butch "knowingly and intentionally became a member of a conspiracy" and whether he "ever joined a conspiracy." The district court ruled that these questions were leading, suggesting, and argumentative, and advised the jury to "disregard this entire line of questioning." Butch argues that these evidentiary rulings infringed on the guarantee provided by the Fifth, Six and Fourteenth Amendments that a defendant in a criminal case has a right to testify on his own behalf. *See Rock v. Arkansas,* 483 U.S. 44, 51–53, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987).

■ Undoubtedly, this guarantee is of great importance. *Id.* at 49, 107 S.Ct. 2704. The right to testify is "essential to due process of law in a fair adversary process." *Id.* at 51, 107 S.Ct. 2704. Nevertheless, "the right to present relevant testimony is not without limitation." *Id.* In *Rock,* which Hach contends "bears great relevance to the present case," the Supreme Court examined whether a defendant's right to present a defense was abridged by Arkansas' blanket exclusion of hypnotically refreshed testimony. *Id.* at 48–49, 107 S.Ct. 2704. The Court held that the defendant's rights were abridged because of the sweeping nature of the prohibition on such testimony. *Id.* at 56–57, 107 S.Ct. 2704. This prohibition was so far-reaching that Rock was "virtually prevented from describing any of the events" relevant to her defense. *Id.* at 57, 107 S.Ct. 2704.

Hach's attempt to analogize this case to *Rock,* however, falls flat on its face. Far from "being virtually prevented from describing any of the events" relevant to his defense, Butch answered a plethora of questions, in which he was able to refute all of the elements of this charge. In fact, this case is so dissimilar to *Rock* that we need not engage in constitutional analysis.

Rather, we are guided by our holdings in *United States v. Espino,* 32 F.3d 253 (7th Cir.1994), and *United States v. Castro,* 788 F.2d 1240 (7th Cir.1986), that it is not reversible error for a trial judge to prohibit a defendant from answering similar questions so long as defense counsel is "able to elicit detailed testimony from his client on all of

the allegations contained in the indictment." *Castro*, 788 F.2d at 1249.

In *Espino*, we held that Federal Rule of Evidence 701[2] prevented a witness from answering questions about whether he was "admitting to a conspiracy." We noted that this questioning contained a legal term of art, and called for improper opinion testimony by a non-expert witness. 32 F.3d at 257. Therefore, that district court's decision to allow those questions was in error. *Id.*[3]

Here, allowing Butch to answer questions about whether he "knowingly and willingly joined a conspiracy" would have required an answer in the form of a legal conclusion that would have been unhelpful opinion testimony. *Id.*; *see also United States v. Baskes*, 649 F.2d 471, 478 at n. 5 (7th Cir.1980) (citing *United States v. Standard Oil Co.*, 316 F.2d 884 (7th Cir.1963)).

It is also very important to note that disallowing these questions did no violence to Butch's overall ability to maintain a defense. In response to questions posed to him by his attorney, Butch testified that:

—he was not dependent on Sajenko or the LaCorcias for his cocaine supply;

—he had no agreement with Sajenko regarding cocaine purchases;

—he never told Sajenko or Tony LaCorcia what he planned to do with the cocaine;

—his purchases of cocaine were not on a regular basis;

—he obtained cocaine from other sources;

—he never had partners in purchasing cocaine;

—he did not know what Carl's cocaine dealings entailed;

—he had no profit-sharing agreements with LaCorcia or Sajenko;

—he had no agreement with Sajenko or LaCorcia as to what he would do with the cocaine; and

—he never pooled his money with Carl or shared the proceeds of his sales with Carl.

This testimony contradicted testimony offered by several government witnesses. If the jury believed Butch, it would have exonerated him completely. Because he had this opportunity, there is no need to disturb the district court's ruling sustaining the objections to these questions. *See Castro*, 788 F.2d at 1249.

### C.

 Butch next contends that the district court erred in failing to give his theory of defense instruction. A defendant is entitled to an instruction presenting his theory of the defense if the proposed instruction meets four conditions: 1) it is a correct statement of the law; 2) the evidence in the case supports the theory of defense; 3) the theory of defense is not part of the charge; and 4) the failure to include the instruction would deny the defendant a fair trial. *United States v. Meyer*, 157 F.3d 1067, 1074 (7th Cir.1998). The third condition is alternatively phrased to mean that a defendant's theory of defense instruction must not include matters already covered by other instructions. *United States v. Robinson*, 96 F.3d 246, 251 (7th Cir.1996). If the defendant can satisfy these four criteria, the trial court's decision not to give the theory of defense instruction provides grounds for reversal. *United States v. Edwards*, 36 F.3d 639, 645–46 (7th Cir.1994). Because the defendant's proposed instruction failed to meet conditions one and three, the district court's ruling not to give the proposed instruction was correct.

**2.** If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue. Fed.R.Evid. 701.

**3.** *United States v. Castro* is not inconsistent with this holding. In *Castro*, we held that it was error for the district court to prohibit defendant's counsel from asking her "[h]ave you ever conspired or agreed ... to sell or possess drugs" and "did you ... agree with anybody to sell or possess drugs," under Federal Rule of Evidence 704. 788 F.2d at 1249. We never addressed, however, the propriety of answering those questions under 701.

■ The defendant's proposed theory of defense instruction meant to bolster his main contention that he was not part of a distribution conspiracy, but was instead just involved in a buyer-seller relationship with his son Carl, Tom Sajenko and the LaCorcias.

The first paragraph of the proposed instruction read in part that, "you may only convict Francis Hach of conspiracy ... if you find that he actually joined in an agreement to distribute. There is a difference between agreeing to possess and consume, and an agreement to distribute cocaine." Judge Shabaz refused to offer this, instead giving a buyer-seller instruction that read, "[t]he fact that a defendant may have bought or sold cocaine from another person is not sufficient, without more, to establish that the defendant was a member of the charged conspiracy." We recently reaffirmed that this precise language is a correct statement of the law in this circuit. *Meyer*, 157 F.3d at 1075; *see also United States v. Lechuga*, 994 F.2d 346, 349 (7th Cir.1993) (*en banc*). This instruction "adequately informed the jury" that Butch could not be convicted merely because he purchased cocaine from his alleged co-conspirators. *See Robinson*, 96 F.3d at 252.

The given instructions also reminded the jurors that the "government must prove that the object and aim of the conspiracy was to distribute cocaine during the time of the conspiracy," and that Butch must have been "aware of the charged conspiracy's common purpose" and have "knowingly and intentionally participated in the conspiracy to achieve that purpose." Opting for this language over the defendant's proposed instruction did not prejudice him or deny him a fair trial. As we noted in *Robinson*, these instructions "made it clear to the jury" on what grounds Butch could be convicted, and thus were reasonable proxies for the defendants theory of the defense instruction. *Id.*

The remaining three paragraphs of Butch's proposed instruction dealt with various facets of conspiracy law. In some instances, the proposed instructions were inaccurate or in-

complete re-statements of the law. One paragraph cut and pasted only the most favorable portions of *United States v. Townsend*, 924 F.2d 1385 (7th Cir.1991), discussed above in § IA; other portions misstated elements of multiple conspiracies, and were generally argumentative and repetitive of the sound instructions Judge Shabaz gave the jury. The district court was not compelled to give the jury Butch's inaccurate, redundant and combative instruction. *See United States v. King*, 126 F.3d 987, 995 (7th Cir. 1997).

**D.**

■ Next, Butch argues that he was deprived of a fair trial when the district court failed to obtain Bonnie Richardson's medical and psychiatric records for purposes of conducting an *in camera* review, and ultimately to release them to him for use in cross-examination. Richardson was a witness for the prosecution. She testified that she obtained cocaine on around twenty occasions from both Butch and Carl, and that she had seen Butch in the company of his alleged co-conspirators. Butch's attorney was afforded every opportunity to cross-examine Richardson at length.

The defendant contends that Richardson's psychiatric and medical records contain detailed information about her long history of drug and alcohol abuse, which could have been used to impeach her. He acknowledges that Richardson revealed to his counsel prior to trial that she abused substances, but argues that the district court was entitled to complete access to her confidential records in order to undertake an *in camera* review, with an eye towards releasing them to him. The defendant sought to compel Richardson and the government to turn this information over, but she refused, and the government argued that it was powerless to force her to acquiesce to this demand. Without the information, Hach contends, his ability to cross-examine and confront her was effectively meaningless.[4] He bases his argument on

---

4. Although Butch mixes the language of both the Sixth and Fourteenth Amendments in couching his claim to Richardson's medical records, we give more searching analysis under the latter

Amendment. In *Ritchie* itself, the Supreme Court specifically noted that the Sixth Amendment "does not include the power to require the pretrial disclosure of any and all information that

*Pennsylvania v. Ritchie*, 480 U.S. 39, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987).

As *Ritchie* explained, under the Fourteenth Amendment, "it is well settled that the government has the obligation to turn over evidence in its possession that is both favorable to the accused and material to guilt or punishment." *Id.* at 57, 107 S.Ct. 989 (citing *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976)); *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Under *Ritchie*, where psychiatric, investigative or medical information is privileged or confidential, it is to be turned over to the trial court for *in camera* review to balance the needs of the defendant and the state or individual's need to keep those records private. 480 U.S. at 61, 107 S.Ct. 989.

While we have our doubts that the defendant can meet his burden of showing that the information in Richardson's records is material to his case, his attempt to bootstrap onto *Ritchie* suffers from a graver problem—the evidence is not and never was in the government's possession. As the Eight Circuit noted in *United States v. Skorniak*, a failure to show that the records a defendant seeks are in the government's possession is fatal to the defendant's claim. 59 F.3d 750, 755 (8th Cir.1995). *Skorniak* ruled that while the government has an obligation to tender to the defense all exculpatory records in its possession, it has no obligation to seek out such information from third parties. *Id.* at 756. The Maryland Court of Appeals, one of the courts to have considered this issue, came to the same conclusion, holding that where confidential records were not under the control of the government, no *Ritchie* claim for production could lie. *Goldsmith v. State*, 337 Md. 112, 651 A.2d 866, 871 (1995).[5] We read these cases to say that if the documents are not in the government's possession, there can be no "state action" and con-

sequently, no violation of Fourteenth Amendment.

By its own terms, Butch's request acknowledges that the records he seeks were not in the government's control—his subpoena did not ask the government to produce the records, but rather asked it to procure a waiver of confidentiality from Bonnie Richardson. The government honored this request, but Richardson refused to acquiesce. Because the records were not within its control, the government was required to do nothing more. Thus, Butch's claim that he is entitled to Richardson's medical records fails.

**E.**

Butch's final non-sentencing challenge is that the district court erred in denying his motion *in limine* to prevent Tom Sajenko from testifying. He contends Sajenko's presence as a witness was not made known to him until days before his trial. At an earlier juncture, the government had averred that all of Butch's co-conspirators had been identified, even though the indictment accused Butch of conspiring with "others known and unknown." When Butch requested a bill of particulars on this issue, the district court rejected the request, because at the time, Sajenko's role was not yet known to the government. Butch alleges that naming Sajenko as a co-conspirator and a witness against him at such a late date unfairly surprised and prejudiced him. He appeals the district court's decisions against him on the bill of particulars and the motion *in limine*.

As the government points out, Butch is really arguing that allowing Sajenko's testimony amounts to a fatal variance between the indictment and the proof offered at trial. *See United States v. Mosley*, 786 F.2d 1330, 1335–36 (7th Cir.1986). "A variance occurs when the terms of the indictment are unaltered, but the evidence offered at trial proves

might be useful in contradicting unfavorable testimony," and thus is unamenable to this kind of claim. 480 U.S. at 53, 107 S.Ct. 989.

**5.** Butch cites to Wisconsin courts which have concluded that even where the state is not in possession of a witness' private medical records the defendant must have access to them, or else

the witness may not testify. However, those courts have based their decisions on state law, not the federal constitution, and as such they are inapplicable to the instant case. *See State v. Shiffra*, 175 Wis.2d 600, 499 N.W.2d 719, 722 (App.1993) (citing *State v. S.H.*, 159 Wis.2d 730, 465 N.W.2d 238 (App.1990)).

facts materially different from those alleged in the indictment" or bill of particulars. *Id.* (citations omitted); *see also United States v. Johnson*, 26 F.3d 669, 686 (7th Cir.1994). However, a variance between the information in a bill of particulars and the evidence at trial is not fatal unless the defendant can show he has been deprived of an adequate opportunity to prepare a defense. *Mosley*, 786 F.2d at 1335.

Butch contends that he was deprived of such an opportunity, because he was unfairly surprised by the inclusion of Sajenko as a witness and unindicted co-conspirator at the last minute. He is correct that the government did not formally notify him that Sajenko would be testifying and was an unindicted co-conspirator until about ten days before the trial. However, prior to that disclosure, Butch was already on effective notice that the government was interested in Sajenko.

For example, at an October 9, 1997 pretrial conference presided over by a Magistrate Judge, the government raised the issue of Sajenko's newly discovered participation in numerous drug transactions with the Haches and LaCorcias. Although neither Butch nor his then-counsel was present at the hearing, an order reflecting these developments was sent to the defendant and his counsel later that day. This alone put Butch on notice that any defense he wished to raise needed to account for Sajenko. As the transcript from the final pretrial conference reflects, the government also noted its interest in Sajenko in a memorandum it filed with the court on October 16, 1997. The same transcript reflects that the government advised Butch's counsel that it was going to subpoena Sajenko, transfer him from an Illinois prison to a Wisconsin jail to interview him, and gave defense counsel its interview notes. Viewed together, it cannot be said that Butch was unfairly surprised when the government announced that Sajenko would be both a wit-

ness and an unindicted co-conspirator in this case.

█ Before moving on, we unhappily note that the government made our analysis much more difficult by including citations to facts not in the record, and misidentifying where in the record facts could be found.[6] Moreover, the government's brief wrongly identified the date of the hearing at which it told defense counsel that Tom Sajenko would be called as a witness.[7] This sits atop the government's admission that it incorrectly represented to the district court at the January 9th, 1998 hearing that Butch Hach and his counsel had attended the October 9th, 1997 pre-trial conference. We are troubled by the government's inaccuracies and caution the need for greater care in the future.

Nevertheless, we do not believe these inaccuracies taint Butch's conviction. As discussed above, even ignoring the government's inaccuracies, Butch had sufficient notice that Sajenko was involved in this matter. He cannot legitimately claim to have been surprised when the government officially notified him that Sajenko would testify. Thus, there was no fatal variance here, and the district court's decision to deny Butch's motion *in limine* was correct.

## II.

### *Butch's Appeal of His Sentence*

Butch appeals the imposition of sentencing enhancements and the $20,000 fine levied against him on a number of grounds. We consider and reject each of them below.

### A.

█ Butch contends that the district court erred in applying an obstruction of justice enhancement to his sentence pursuant to U.S.S.G. § 3C1.1. At the outset, we note that our review of a § 3C1.1 sentencing en-

---

**6.** The government cited repeatedly to evidence from the LaCorcias' trial that is not in the record, as well as an interview with Tony LaCorcia which does not appear anywhere in the record before us.

**7.** In its brief, the government claims that the hearing took place on December 18, 1997; the

hearing at which the government told Butch's counsel that Sajenko would actually be a witness was on January 9, 1998. This is of some moment because it gives the impression that Butch's lawyer was orally notified of Sajenko's status much earlier than actually occurred.

hancement is "very limited." *United States v. Ramunno*, 133 F.3d 476, 480 (7th Cir. 1998). Judge Shabaz found·that Hach provided materially false testimony both at trial and during a sentencing hearing, and thus imposed a two-level sentence enhancement. Because this is a finding of fact, we will only disturb it upon a showing of clear error. *United States v. Doe*, 149 F.3d 634, 640 (7th Cir.1998). Hach must show us that the district court's factual findings are incorrect— merely showing that they might be erroneous is insufficient. *Ramunno*, 133 F.3d at 480 (citing *Anderson v. Bessemer City*, 470 U.S. 564, 573, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985)).

 A defendant qualifies for an enhancement under § 3C1.1 if the district court finds he gave "false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." *United States v. Agostino*, 132 F.3d 1183, 1198 (7th Cir.1997) (quoting *United States v. Dunnigan*, 507 U.S. 87, 94, 113 S.Ct. 1111, 122 L.Ed.2d 445 (1993)). Under *Dunnigan*, the district court must make "independent findings" of perjury and identify specific false testimony to support an enhancement. 507 U.S. at 95–96, 113 S.Ct. 1111; *Doe*, 149 F.3d at 640. Once the district court points to such testimony, if it is convinced beyond a reasonable doubt that the defendant told a fabricated story on the stand, it may impose the enhancement. *United States v. Hofer*, 995 F.2d 746, 750 (7th Cir.1993).

In deciding that the defendant's testimony was unbelievable, the district court weighed Butch's credibility against the other witnesses' and found the defendant's testimony perjurious. Specifically, the district court stated that "Mr. Butch Hach does not tell the truth. He lied to the Court . . . when he told us about the locked door to his son's room . . . . [This story of a] locked bedroom has no doubt occurred since the jury's verdict and the sentencing in this matter." The district court also averred that it found the defendant's story about how he financed his cocaine purchases highly implausible, noting that the "jury almost gasped" at this testimo-

ny. Finally, Judge Shabaz catalogued numerous other discrepancies between Butch's testimony and other witnesses' regarding whether he met people, whether and how much cocaine he sold to specific buyers, and whether Butch had "cut" his cocaine with additives. All of these were material facts, and were not the kind of testimony about which the defendant would plausibly have been mistaken. *See United States v. Doe*, 149 F.3d at 640. Based on all this, the district court imposed the enhancement.

 This defendant makes much of our directive in *United States v. Hofer*, that in a § 3C1.1 hearing, the district court must construe testimony in the light most favorable to the defendant. 995 F.2d 746, 749 n. 7 (7th Cir.1993). He takes this to mean that Judge Shabaz should have resolved all cases of disputed testimony in his favor. This cannot be right. We have held that the ·"light most favorable mandate" does not require a court to accept the defendant's version of events. *See United States v. Jones*, 950 F.2d 1309, 1316 (7th Cir.1991) ("if [this mandate] were applied in the fashion the defendant suggests, the court would never apply the enhancement, for viewing the evidence in the manner the defendant proposes would mean always resolving swearing contests in favor of the defendant"). All it means is that when the judge "after weighing the evidence, has no firm conviction" the benefit of the doubt goes to the defendant. *United States v. Vaquero*, 997 F.2d 78, 85 (5th Cir.1993) (citations omitted). Here, Judge Shabaz had a firm conviction that Butch lied; he evaluated Butch's testimony and justifiably concluded that he had perjured himself on multiple occasions. An enhancement was clearly warranted.

## B.

 This defendant also challenges the inclusion of a 1985 "operating while intoxicated" (OWI) conviction in his criminal history. We review the district court's findings of fact at sentencing for clear error, and its interpretation of the Sentencing Guidelines de novo. *United States v. Hoggard*, 61 F.3d 540, 541 (7th Cir.1995) (per curiam).

In the 1985 conviction Butch was unrepresented by counsel. He contends that the record from the OWI conviction is insufficient to establish that he voluntarily, intelligently and knowingly waived this right. Courts are proscribed from increasing a sentence based on a conviction from a proceeding in which the defendant was unconstitutionally denied the right to assistance of counsel. *United States v. Katalinich*, 113 F.3d 1475, 1481 (7th Cir.1997). However, we start with the presumption that the prior uncounselled conviction was in fact constitutional. *Id.* The defendant has the burden of proving the prior conviction invalid. *Id.*; *United States v. Pedigo*, 12 F.3d 618, 629 (7th Cir.1994).

Butch's "proof" that he did not knowingly waive his right to counsel in the 1985 matter is that no transcript of that proceeding exists. To rebut that contention, the state produced the affidavit of a court reporter for the now-deceased judge who presided over Butch's OWI arraignment. She testified that it was that judge's routine practice to advise all persons before him of his or her right to counsel, and to give each individual a form letter advising him or her of one's right to an attorney if they could not afford representation. Because there exists a strong presumption of regularity in state judicial proceedings, we place great weight on this affidavit. *See Cuppett v. Duckworth*, 8 F.3d 1132, 1136 (7th Cir.1993). Butch offered no evidence either refuting the court reporter's testimony, or showing that he did not waive his right to counsel voluntarily, and so he cannot rebut this presumption. *Hoggard*, 61 F.3d at 543. Accordingly, we find that the district court properly included the 1985 OWI conviction in Butch's criminal history calculation.

### C.

Butch's last individual challenge is to the $20,000 fine Judge Shabaz imposed on him. The Sentencing Guidelines require that a district court impose a fine unless the defendant establishes that he is currently unable to pay and is not likely to become able to obtain the means to pay. U.S.S.G. § 5E1.2(a); *United States v. Bauer*, 129 F.3d 962, 964 (7th Cir.1997). If the district court concludes a fine is in order, we will only reverse its factual finding if it is clearly erroneous. *United States v. Petty*, 132 F.3d 373, 382 (7th Cir.1997).

Here, the district court took the unusual step of imposing a fine despite the fact that the presentence report (PSR) recommended that the defendant was unable to pay. When a district court adopts the PSR's fact finding but deviates from its fine recommendations, it must articulate why it chooses this route. *Petty*, 132 F.3d at 383. Here Judge Shabaz took detailed stock of the defendant's assets and liabilities. The district court noted that the PSR found total assets of $105,350 in Butch's name. The court addressed Butch's professed inability to pay the fine, and subtracted $44,700 in recently imposed liens from the $105,350, leaving around $60,000 in assets remaining. Based on this finding, it was not clearly erroneous to impose a $20,000 fine.

### III.

*Butch and Carl's Joint Appeals to Their Sentences*

Butch and Carl jointly challenge the district court's calculation of the drug quantities on two grounds. First, they assert that they did not buy 5,896 grams of cocaine from Sajenko and Nick LaCorcia between 1990 and 1992. Second, they contend that they should not be held liable for each other's cocaine purchases and sales. Judge Shabaz held them jointly liable for the entire 8,341 grams of cocaine he attributed to the conspiracy.

A district court's calculation of the quantity of drugs involved in an offense is a finding of fact to be reversed only for clear error. *United States v. Acosta*, 85 F.3d 275, 279 (7th Cir.1996). Only if the entire body of evidence leaves us with a "definite and firm conviction that a mistake has been committed" will we reverse. *United States v. Beler*, 20 F.3d 1428, 1431 (7th Cir.1994); *United States v. Duarte*, 950 F.2d 1255, 1265 (7th Cir.1991).

## A.

The district court based most of its calculations on Sajenko's testimony. It found that between 1990 and 1992, Nicholas LaCorcia delivered to Butch and Carl separately two ounces of cocaine every ten days to two weeks. Multiplying four ounces by fifty-two weeks (every other week for two years), Judge Shabaz concluded that 5896.8 grams of cocaine had traded hands. The district court also laid out detailed calculations for 1992–1997.

The defendants main challenge is to the 1990–1992 calculation. They contend that based on Tom Sajenko's testimony, it was not possible for Judge Shabaz to conclude that 5896.8 grams were dealt in that period. Accordingly, they argue, their right to be sentenced on the basis of accurate information was violated. *See United States v. Ewers*, 54 F.3d 419, 421 (7th Cir.1995).

The record shows however, that Sajenko clearly stated how much cocaine he sold the defendants. It is true that in his pre-trial interview with government narcotics agents, Sajenko apparently did not indicate that he was dealing two ounces every other week to Butch and Carl. At trial, however, Sajenko stated that between 1990 and 1992, Nick LaCorcia would often take him to the defendants' house to sell cocaine. When asked how often he and Nick LaCorcia sold cocaine to the defendants, Sajenko testified "[a]t least once every ten days." When asked how much cocaine Butch purchased from them, Sajenko testified ."Butch was buying about two ounces." When asked the same about Carl, he testified "Carl was buying the same if not more." He reiterated that these sales he and LaCorcia made together took place beginning in 1990, and ended when he started making sales himself in late 1992 or early 1993. Based on this testimony, we conclude that the district court's calculation was correct.

The defendants also argue that Sajenko's testimony was "inherently unbelievable" because Sajenko was a drug user, and he was granted immunity by the government from prosecution. While we recognize that Sajenko was far from a pristine witness, we do not "assess the credibility of witnesses." *United States v. Ferguson*, 35 F.3d 327, 331 (7th Cir.1994). Whether to put stock in Sajenko's testimony was a decision for the district court, so long as the testimony had "sufficient indicia of reliability to support its probable accuracy." *United States v. Cedano–Rojas*, 999 F.2d 1175, 1180 (7th Cir.1993) (citations omitted). Here, much of Sajenko's testimony corroborated Butch's; while they disagreed about particulars of how much cocaine was sold and when, much else overlaps. Additionally, Sajenko's testimony about other matters, including the lay-out of the Blacksmith Shop, the kinds of scales used in the transactions, and the lulls in drug transactions, was accurate. This supplied the requisite "indicia of reliability" Judge Shabaz needed to credit Sajenko's testimony.

## B.

The final issue the defendants raise is whether they should have been held accountable for each other's actions. This claim faces the immediate obstacle of a simple fact: both men were found guilty of participating in the same conspiracy to distribute cocaine. Of course, in a conspiracy, defendants are not only responsible for the crimes they personally commit—they may also be liable for crimes committed by co-conspirators undertaken in furtherance of the conspiracy and reasonably foreseeable to them. *United States v. Doyle*, 121 F.3d 1078, 1091 (7th Cir.1997).

Here, there is little doubt that Butch and Carl were aware of each other's activities in the conspiracy, and that those acts were meant to advance their overall conspiracy. Underscoring this is the fact that they actively participated in certain actions together— cocaine deliveries were often made simultaneously to the defendants; when Carl wasn't home, Butch would facilitate Carl's receipt of the cocaine and Sajenko weighed cocaine in Carl's room for both of them. Most importantly, Carl obtained for himself and supplied to Butch a chemical known as inositol, which they both used to cut their cocaine. This allowed them to decrease the cocaine's purity, and increase their volume for future sales.

Based on this, there was sufficient evidence for the district court to hold Carl and Butch Hach accountable for the total amount of cocaine distributed to them.

## IV.

For the forgoing reasons, the judgment of the district court is AFFIRMED.